UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
RAMON ANTONIO LOPEZ        :
                           :
                           :
                           :
v.                         :   CIV. NO. 3:08CV678 (JCH)
                           :
TARA MCEWAN, ET AL         :
                           :
                           :
                           :
                           :
```

<u>RECOMMENDED RULING ON MOTION FOR PRELIMINARY INJUNCTION</u>

Ramon Antonio Lopez, a Connecticut inmate proceeding <u>pro se</u>, brings a civil rights action under 42 U.S.C. §1983 for violation of his First, Fifth, Eighth and Fourteenth Amendment rights under the United States Constitution.

Plaintiff seeks a preliminary injunction against defendants[1], who are current and former employees of the Connecticut Department of Corrections, to prevent them from classifying the plaintiff to Administrative Segregation for

---

[1]Defendants are Correctional Counselors Tara McEwan and Jon Kay, Captain Dennis Oglesby, Lieutenant Cormier, Deputy Warden Valerie Light, Warden Jeffrey McGill, District Administrator Wayne T. Choinski, Director of Programs and Treatment Mary Marcial, and Deputy Commissioner Brian K. Murphy, Joseph Smith, Brian Bradway, Gerald Hines, Nancy Otero, Stephen Clapp, Fred Levesque and Commissioner Theresa Lantz. [First Amend. Compl. dated Oct. 27, 2009, Doc. #68]. Defendants are current and former employees of the Connecticut Department of Corrections. Unit Manager Jason Cahill testified that a number of the defendants named in this action have either retired or are no longer in a position to directly affect the plaintiff's living conditions at NCI. Among the defendants who retired are: former NCI Warden Jeff McGill, Former District Administrator Wayne Choinski, and former Director of Programs, Treatment Mary Marcial and former Commissioner Theresa Lantz.

1

engaging in protected activities.  Specifically, plaintiff contends that in retaliation for alleging an improper relationship between an inmate and correctional counselor, he has been given false disciplinary tickets, placed indefinitely in administrative segregation, and deprived of opportunities to file grievances.

Pursuant to his First Amended Complaint dated October 27, 2009, plaintiff seeks to preliminarily and permanently enjoin defendants[2] from:

1.    Housing plaintiff in administrative segregation[3];

2.    Requiring plaintiff to participate in the administrative segregation program;

3.    Transferring plaintiff to serve his sentence out of state;

4.    Retaliating against plaintiff;

5.    Violating plaintiff's First Amendment rights, including but not limited to, retaliatory disciplinary actions for "non-threatening" grievance writing;

6.    Intimidating, threatening or punitively acting against "plaintiff or other inmates for writing grievances against staff and/or inmate rights in general";

7.    Intimidating, threatening or punitively acting against "plaintiff or other inmates for exercising their First

---

[2]Defendants McEwan, Oglesby, Salinus and McGill are no longer employed at NCI.  Hrg. Tr. at 61.

[3]Specifically, plaintiff objects to indefinite confinement in Administrative Segregation and seeks an order returning him to his unit and the return of his property. [Doc. #39 at 7],

2

Amendment rights, including filing this action, or for

engaging in protected activities in a non disruptive

manner."

[First Amend. Compl. Doc. #68 at 38-39].

Since the injunction hearing has not been consolidated with

a trial on the merits, the only issue pending is whether a

preliminary injunction should enter.  For the reasons that

follow, the Motion for Preliminary Injunction **[Doc. #39]** is

**DENIED.**[4]

Testimony and evidence adduced at the hearing are summarized

below as necessary to explain the Court's findings and

conclusions.[5]

## I.   FINDINGS OF FACT

Based on the credible testimony, the exhibits, and the

entire record developed during the evidentiary hearings on

October 27, 2009, the Court finds the following facts established

---

[4]A Motion for Temporary Restraining Order was filed on June
12, 2009. [Doc. #39]. Judge Hall denied the motion on June 19,
2009, without prejudice. [Doc. #42].  By agreement, discovery
was conducted and the Motion for Temporary Restraining Order was
converted to a hearing on an Application for Preliminary
Injunction. Plaintiff renewed the Motion for Temporary
Restraining Order on September 22, 2009. [Doc. #57]. An
evidentiary hearing was held on October 27, 2009. [Doc. #65].
Defendants filed a post-hearing memorandum on November 6, 2009.
[Doc. #69].  Plaintiff filed a reply brief on December 3, 2009.
[Doc. #77].  The hearing transcript was filed on January 3, 2010.
[Doc. #78].

[5]Ramon Antonio Lopez and Unit Manager 1-East Jason Cahill
testified at the hearing.

for the purposes of the injunction proceedings.

1.    Plaintiff Ramon Antonio Lopez is a state prisoner housed at
      Northern Correctional Institution ("NCI") in Somers
      Connecticut. Hrg. Tr. Doc. #78 at 1.   Plaintiff is assigned
      to NCI's Administrative Segregation 1-East in the Phase I
      Unit. Id. at 96.

2.    Plaintiff is serving a seventeen year sentence for first
      degree assault.  Plaintiff has eight more years to serve on
      his sentence.  Hrg. Tr. at 62.

3.    From June 14, 2006, to March 7, 2008, Lopez was housed in
      Closed Custody in the 2-East Unit at NCI, on single-cell,
      recreation-only, status with some personal property
      privileges. Id. at 5, 51. Lopez testified that he had been
      on single-cell status since June 2006. Hrg. Tr. at 41.

4.    Lopez testified on cross examination that he was disciplined
      in November 2006 for possession of contraband,  Id. at 51;
      on December 12, 2006, for interfering with safety and
      security; and on June 15, 2007, for violation of program
      provisions.  Id. at 52.

5.    On September 17, 2007, plaintiff sent a greeting card to
      Counselor Tara McEwan professing feelings of concern and
      describing his perception of his relationship with the
      counselor. Hrg. Tr. at 44.  Lopez received a disciplinary
      report and was instructed not to communicate in this fashion
      with Counselor McEwan again. Id. at 46-47.

6.    On or about October 17, 2007, Lopez sent an eight page

4

letter to Counselor Tara McEwan, expressing his love and
affection for her.  Pl. Ex. 14. Lopez received a
disciplinary report for using "insulting language or
behavior" toward Counselor McEwan.  Hrg. Tr. at 52. Lopez
testified that the purpose of the letter was to "tip-off the
higher-ups who would read this letter and investigate it.
They did not."  Id. at 75-76.  He believed that McEwan
"mischaracterized" the letter in her disciplinary report.
Id.

7.   Lopez testified that it was appropriate to communicate with
Counselor McEwan in this manner.

A.  So long as I didn't cross the line of actually
insulting, it was okay for a while.

Q.  And you get to decide what's insulting to Counselor
McEwan?

A. Yes. As the author of the letters, yes.

Hrg. Tr. at 92.

8.   On cross examination Lopez admitted to sending Counselor
McEwan communications on both November 19 and 20, 2007. Both
times Lopez was told not to communicate with Counselor
McEwan. Hrg. Tr. at 48-49.  Lopez received discipline for
"flagrant disobedience" for continuing to communicate with
Counselor McEwan.  Id. at 50, 52. Lopez testified that this
"was another attempt by me to tip-off the higher-ups
correctional officials or supervisors, somebody, to
investigate what's really going on in this unit. Even though

it was friendly-of a friendly nature, in and at the same
time, an . . . paraded attempt to tip-off the higher-ups,
McEwan took that as an opportunity to write a disciplinary
report." <u>Id.</u> at 77.

9.   Lopez testified that at the time he wrote these
communications to Counselor McEwan he was housed in the
Closed Custody program and he was aware that if he
accumulated disciplinary reports he could be placed in
Administrative Segregation.  <u>Id.</u> at 51.

10.  On January 31, 2008, Lopez was interviewed by Investigating
Officer Christopher Burns of the State of Connecticut
Department of Public Safety regarding allegations contained
in a letter from Lopez to Commissioner John Danaher III,
dated January 10, 2008.  Pl. Ex. 501.  During the interview
Lopez stated, among other things, that he believed that an
inmate, Francisco Roman, was having a sexual affair with DOC
Counselor Tara McEwan.  <u>Id.</u>   Lopez reported that inmate
Roman made several threats against his life. Lopez reported
that he took the threats seriously because the inmate is a
ranking member in the Latin Kings.  <u>Id.</u>  Lopez and Roman
were housed in adjacent cells.  <u>Id.</u>

11.  At Lopez's direction, Officer Burns obtained copies of: (1)
Disciplinary Reports dated 9/17/07, 10/24/07, and 11/21/07
written by Counselor McEwan: (2) a greeting card; (3) an 8
page letter; and (4) a letter to the 11/21/07 disciplinary
report.  <u>Id.</u>

6

12.   Officer Burns made the following findings,

the disciplinary reports were written by
Counselor McEwan regarding Mr. Lopez's
"insulting language or behavior," "and
flagrant disobedience."  In the disciplinary
report written on 11/21/07 Counselor McEwan
wrote: "On the above date and time this
writer received a note from inmate Lopez,
Ramon #261685 with insulting language in it.
He has been given several direct orders to
stop writing such requests. He has also
received several DRs (disciplinary reports)
pertaining to this behavior, and he still
continues to do so."  Attached to the
disciplinary reports are several letters
written by Mr. Lopez to Counselor McEwan that
were romantic in nature. After reading the
disciplinary reports along with the attached
letters I surmised that Mr. Lopez was
captivated by Counselor McEwan and it's
plausible that he felt rejected as a result
of the disciplinary reports. Mr. Lopez
explained to me that the letters were really
not romantic rather he was using "code words"
in order to discern Counselor McEwan's real
feelings.  Mr. Lopez's allegation of an
affair between Counselor McEwan and Mr. Roman
was made after the aforementioned
disciplinary reports were issued.

. . . . .

Presently there is no evidence of a
conspiracy in the Department of Corrections.
On 1/31/08 at approximately 1330 hrs I spoke
with State's Attorney Matthew Gadansky of GA-
19 in Rockville regarding the investigation
at which time he stated there is insufficient
probable cause to substantiate any criminal
charges. Sergeant Guari advised me to suspend
the investigation and the case is currently
classified as a suspicious incident. . . .

Pl. Ex. 501.

13.   On cross-examination Lopez admitted that his feelings for

Counselor McEwan were romantic in nature.  Hrg Tr. at 60-61.

7

14. On February 14, 2008, Lopez received a Class A offense D.R. from defendant McEwan for an "SRG [Security Risk Group] affiliation," when he requested copies of correspondence containing known Latin King identifiers. Pl. Ex. 502; Pl. Ex. 3. Lopez's appeals were denied.  Pl. Ex. 3.

15. Lopez testified that he requested Counselor McEwan copy these materials "to document as proof as to how defendant McEwan continued to violate the confidentiality privilege of legal documents that are submitted for legal copying."  Hrg. Tr. at 78.

16. On cross-examination, Lopez stated that since April 2005, he has been classified by the Department of Corrections as a part of a Security Risk Group, affiliated with the Latin Kings.  Id. at 89.

17. On February 14, 2008, Lopez received a Class A offense D.R. from defendant McEwan for "flagrant disobedience," for disobeying a clearly stated order from Counselor McEwan to cease writing offensive letters.  "Inmate Lopez has been given several direct orders to refrain from this behavior, as well has been given D.R.s pertaining to this issue. He continues to disregard this writer's instruction to cease this behavior." Pl. Ex. 2. Lopez's appeals were denied.  Id.

18. Lopez testified that the letter to McEwan was included in the articles he submitted to McEwan for legal copying and she "assumed that the letter was for her."  Hrg. Tr. at 56.

19. Lopez filed a complaint against Counselor McEwan alleging

abuse of the "D.R. process out of maliciously vindictive reasons . . . to cover up her undue familiarity romantic relationship with inmate Francisco Roman. . . ."  Pl. Ex. 3.

20.  Lopez filed a grievance on February 26, 2008, seeking an investigation into "an undue familiarity romantic sexual affair between Unit Counselor Tara McEwan and inmate Francisco Roman. . . ."  Pl. Ex. 4.  On April 10, 2008, plaintiff was notified that "Your grievance regarding staff conduct is compromised. Your complaints are currently being reviewed at a higher level."  Pl. Ex. 4.

21.  On March 4, 2008, Lopez received a Class B offense D.R. from defendant McEwan for "Insulting Language," directed at Counselor McEwan.  Pl. Ex. 5. Plaintiff's appeals were denied.  Id.

Administrative Segregation Unit 1-East

22.  On Friday, March 7, 2008, Lopez was moved to Phase I of Administrative Segregation in Unit 1-East.  Id. at 5; Pl. Ex. 6.

23.  In response to a letter from Attorney Matthew Sorokin, plaintiff's counsel, NCI Warden Jeff McGill responded, "At the present time, a transfer to another facility is not an option. We are in the process of placing a separation between the two, which will physically separate them."[6]  Pl. Ex. 11.

24.  Lopez was notified of a hearing on April 3, 2008, setting a

---

[6]Attorney Sorokin's letter is not part of the record.

hearing on April 9, 2008, regarding consideration for placement in Administrative Segregation.  "Reason for Hearing" states,

> You have been managed as a Close Custody inmate since November 3, 2005. (1) Since that time you have been managed in the Phase 1 of Close Custody program for over 2 ½ years. You have refused to progress to Phase 2 resulting in a Violation of Program Provisions Disciplinary Report on 6/15/07. Additionally, you have received (3) Class "A" and (3) Class "B" disciplinary reports since that time, which include (3) Insulting Language of Behavior, (2) Flagrant Disobedience and (1) Security Risk Group Affiliation. Per Administrative Directive 9.2, section 12 any inmate that "continues to present a threat to safety, security and/or orderly operation after one (1) year in Close Custody for Security Risk Groups: may be reviewed for Administrative Segregation placement. Due to your continual and disruptive behavior and lack of motivation to progress through the Close Custody Phases, Warden McGill has requested that you be reviewed for Administrative Segregation placement.

Pl. Ex. 7.

25. Lopez prepared an Advocate Investigation Report, dated April 7, 2008,  in opposition to his placement in Administrative Segregation.  Pl. Ex. 8.

26. On April 9, 2008, plaintiff was assigned an advocate for the hearing after which placement in Administrative Segregation was recommended. "Reasons for Recommendation" states,

> Subject has displayed poor disciplinary behavior while in SRG Close Custody program. He has received numerous disciplinary infractions for writing threatening and insulting requests to the unit counselor.  In addition, was recently (2/14/08) found guilty of SRG Affiliation. He wrote a letter that

> had numerous Latin King Symbols in. It
> appears he has no interest in progressing and
> completing the SRGTM program, nor does he
> have a desire to renounce his gang
> membership, as opposed to his claims that he
> is unable to participate due to Protective
> Custody concerns (see witness statement).
> Therefore, he needs to be housed in a higher
> structured program.

Pl. Ex. 9.  The placement recommendation was authorized on April

16, 2008. Id.  Plaintiff's appeal was denied on May 8, 2008. Pl.

Ex. 10.

27.  On May 1, 2008, Attorney Sorokin sent a letter to DOC

Commissioner Lantz, stating in relevant part,

> I am currently writing to you to strongly
> urge you to take immediate action to resolve
> the imminent danger to Mr. Lopez's well-
> being, and to strongly suggest that you
> expedite Mr. Lopez's transfer to a new
> facility.  Furthermore, this letter shall
> serve as personal notice to you that Mr.
> Lopez's safety is in jeopardy, and that, to
> date, the department of correction has been
> aware of this problem yet has done nothing to
> remedy it.

Pl. Ex. 12.

28.  Lopez's appeal of his classification to Administrative

Segregation status was denied on May 8, 2008. "You have had

significant opportunity to progress through the Close

Custody Program, yet you continued to accumulate serious

disciplinary infractions and remain in the program's first

phase.  It is now in your best interests to utilize this

time in Administrative Segregation to participate in

assignments and conduct yourself in a manner that will lead

to your eventual return to General Population status. . . ."

11

Pl. Ex. 13.

29. On November 21, 2008, plaintiff received a disciplinary report for the Class (A) offense, "Violation of Program Provisions," specifically his refusal to accept the terms of progression to Phase II of Administrative Segregation and to allow staff to apply restraints and move him to 3 East unless housing and programming concession were made on his behalf. [Pl. Ex. 18].   Upon signing the Northern Correctional Institution Administrative Segregation Phase Program Phase II Acknowledgment Form, Lopez wrote, "provided single cell rec-alone no inmate contact status is extended due to excessive threats from known and unknown inmates." Id. On appeal, Lopez identified Blood Gang members Woody Boisette and Terrance Williams, "and others not known by name" as sworn to physically harm him. Id.

30. Lopez testified that his housing was moved because of the allegations he made regarding an improper relationship between defendant Tara McEwan and inmate Roman.   Id. at 5.

Administrative Segregation

31. Jason Cahill is the Unit Manager for 1-East Housing Unit at NCI where plaintiff is currently housed. Id. at 95.

32. Cahill testified that the purpose of the Administrative Segregation Program is to progress inmates into general population.   Id. at 98.  It is a three stage program.  Phase I is the most restrictive, whereby the DOC tries to "teach inmates how to live in general population without having

12

assaultive or consequential behavior that would get them placed or segregated into other facilities, restrictive housing units." Id. at 98.

33. Cahill testified that Lopez was assigned to Administrative Segregation because of "chronic failure," for multiple disciplinary reports and infractions. Id. at 95.

34. Cahill testified that plaintiff has remained in Phase I of Administrative Segregation because he "refuses to progress to Phase II." Id.

35. Cahill explained that an inmate's housing status is reviewed every four months by a panel comprised of DOC staff. Lopez is approved to progress to Phase II but Lopez refuses to accept the terms and conditions of Phase II and refuses to be moved to a Phase II housing unit. Id. at 97.

36. Cahill testified that Lopez "directly demanded single-cell status, rec-alone status, and refused to participate in any type of out-of-cell programming." Id. Lopez told Cahill that "people were out to get him." Id. When asked by Cahill, Lopez did not identify anyone by name. Id.

37. Cahill testified that the "majority of inmates . . . are . . . . doing the program, progressing through, whatever incident they may or may not have had, they want to try and put that behind them and get out of Northern. Nobody wants to really stay at Northern.  It's a very restrictive environment. There is a small minority, . . . that have become comfortable there, to an extent, demanding single cells, rec

alone. Basically, not wanting to be around other inmates."
<u>Id.</u> at 100.  Lopez is such an inmate.  <u>Id.</u> at 101.

38. Cahill stated that Lopez is currently housed on a "three-man
tier above special needs inmates and adjacent to death row
inmates.  It's a relatively quiet area."  <u>Id.</u> at 101.

39. Cahill testified that the Department of Corrections had no
plan to physically force Lopez to take a cellmate, to have
direct inmate contact, to participate in recreation with
other inmates, or to participate in programming that would
give him out-of-cell inmate contact.  <u>Id.</u> at 100-01.

40. He explained,

> To forcibly, or physically, attempt to have
> an inmate participate in a program would [be]
> somewhat futile.  If we attempted to
> forcefully move him up the hallway, and at
> that point, you're endangering staff safety,
> as well as the inmate safety, and it would
> only cause another incident that would result
> in the inmate being returned to Phase I,
> Administrative.  So it-no, it wouldn't serve
> a purpose.

<u>Id.</u> at 102.

41. As Lopez's Unit Manager, Cahill spoke to Lopez at length
about a move "up the hallway to get a feel for the program,
even if it was temporarily on single-cell status, even if it
also gave me the opportunity to identify these alleged
individuals that [Lopez] claims want to assault him or bring
harm to him.  We have had a conversation about that. He
seemed receptive at the time, and then when he was served
with his progression paperwork, he refused again, demanding

14

single-cell status, rec-alone status, and no programming
status." Id. at 103.

42. When asked to characterize Lopez's demeanor in rejecting the
plan to progress into Phase II, Cahill testified that Lopez
"became pretty hostile at times. Initially, you can have a
conversation with him, but when push comes to shove, and
you're looking to have him participate in a program, he
tends to fly off the handle a bit." Id.

43. Lopez "received a violation of programs provision ticket, or
disciplinary report" for refusal to progress to Phase II of
Administrative Segregation and through that process, "if you
receive punitive segregation time, his property would be
limited to that in directive 6.10, Attachment C for those
inmates placed in punitive segregation or administrative
detention." Id. at 104.

44. Lopez has been approved to progress to the next Phase of
Administrative Segregation. There is nothing preventing
Lopez from progressing to Phase II, other than his refusal
to participate. Id.

45. On August 19, 2009, Lopez submitted a request to Warden
Angel Quiros to be housed in protective custody "that would
manage inmates on single cell recreation alone status. Due
to the multi-factorial nature of my situation I cannot go
out of state; I cannot go to any of the Connecticut P.C.
[protective custody] Jails/Units or General Population
without putting my personal safety at risk." Pl. Ex. 15.

Cahill testified that Lopez's request was not considered
during the classification review hearing.  Id. at 107.
"Certainly, if there was a legitimate threat to an
individual that involved the safety and security of that
individual, we would certainly act on it immediately . . .
[In reference to exhibit 15], you've made several
allegations that you cannot go out of state, that you cannot
be placed in protective custody. Yet by the nature of the
letter, it sounds to me as if you're requesting protective
custody."  Id. at 107-08.

46.  Cahill stated on cross that, although Lopez alleges that his
     life is in jeopardy, he has not specified "by whom or by
     what" he is threatened beyond general comments that his life
     is in jeopardy.  Id. at 109.

47.  Cahill stated that inmates in protective custody are housed
     at a different facility, not in Administrative Segregation
     at NCI.[7]  Id. at 110.

48.  Cahill stated that Lopez is not in protective custody
     status.  Lopez is profiled against several other inmates,
     who are at NCI. None of the inmates profiled with Lopez is
     housed in his Unit.  Id. at 128.

49.  If Lopez were to progress to another phase of the program,
     Cahill explained, Lopez would not be housed with any of the
     profiled inmates.  Id. at 128.

---

[7]Cahill testified that inmates who are assigned to
protective custody are housed at the Cheshire Correctional
Institution.  Hrg. Tr. at 127.

16

50.  As an inmate moves to Phase II, a background check is done
     to see if the group is compatible to do the program
     together.  Id. at 1129.

51.  On October 22, 2009, plaintiff refused to sign a Northern
     Correctional Institution Administrative Segregation Phase
     Program Phase II Acknowledgment Form.[8] [Pl. Ex. 17]. Cahill
     testified that the failure to progress to Phase II is what
     constitutes the actual disciplinary report for violation of

---

[8]The Northern Correctional Institution Administrative
Segregation Phase Program Phase II Acknowledgment Form states,

    I acknowledge that by signing this form, which I have
    read and have had explained to me, I understand what is
    expected of me in Phase II of the Administrative
    Segregation Program.

    Further, I Understand That:

1.  My behavior in Phase II will be closely monitored.
    Inappropriate behavior or disrespect toward staff or other
    inmates may result in my return to Phase I.
2.  If I receive a Class A Disciplinary Report, I will be
    returned to Phase I.
3.  If I receive Punitive Segregation as a Disciplinary
    Sanction, I will be returned to Phase I.
4.  If I have Mental Health issues and refuse to cooperate with
    Mental Health Staff, I may be returned to Phase I.
5.  I will be required to attend and fully participate in all
    programming components in Phase II.  If I refuse, I will be
    returned to Phase I.
6.  I am responsible for maintaining all program material in
    good order, and for bringing required material to each class
    as directed.
7.  I am expected to carry out each work assignment in a
    professional and expeditious manner, striving always for
    quality results.  If I receive poor work reports I may be
    returned to Phase I.
8.  I am expected to maintain a good attitude while in Phase II.
    A poor or negative attitude may result in my return to Phase
    I.

Pl. Ex. 17.

program provisions.  Hrg. Tr. at 112.

52. Cahill agreed that it is "possible" that an inmate with gang
    ties might assault another inmate out of gang loyalty, but
    added it was difficult to identify unknown enemies.  Id. at
    118.

53. Cahill testified that in-cell programming is available in
    Phase I of Administrative Segregation only.  Id. at 119.

54. Cahill stated that upon transfer to another DOC facility,
    Lopez would not be housed with at risk inmates who have been
    identified by plaintiff and documented.  Id. at 121.   But
    it is possible that plaintiff would be housed with unknown
    "enemies."  Id.

55. On cross-examination, Lopez testified that the last time he
    had a cellmate was June 2006 and, since then, he has not
    agreed to participate in any inmate out-of-cell program
    since he was placed in closed custody. Hrg. Tr. at 62-63.

56. Lopez testified that he is seeking an order of preliminary
    relief, "reversing the retaliatory decision to classify
    [him] to Administrative Segregation."  Id. at 62-63.
    Specifically, Lopez seeks "single-cell, recreation-alone
    status, which were the same inmate management type . . .
    that I was under when I was in the closed custody program
    for my safety."  Id. at 66.

DISCUSSION

Interim injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (emphasis, internal quotation marks and citation omitted).  "A party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2) a likelihood of irreparable harm if the requested relief is denied." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 152-53 (2d Cir. 2007). The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006).  To prevail on a motion for preliminary injunctive relief, the plaintiff must establish that "the alleged threats of irreparable harm are not remote or speculative but actual and imminent." New York v. Nuclear Regulator Commission, 550 F.2d 745, 775 (2d Cir. 1977).

If a party seeks a mandatory injunction, i.e., an injunction that alters the status quo by commanding the defendant to perform a positive act, he must meet a higher standard. "[I]n addition to demonstrating irreparable harm, '[t]he moving party must make a clear or substantial showing of a likelihood of success' on the merits, . ..  a standard especially appropriate when a

19

preliminary injunction is sought against government." <u>D.D. ex</u>
<u>rel. V.D. v. New York City Bd. of Educ.</u>, 465 F.3d 503, 510 (2d
Cir. 2006) (citations omitted).

Lopez is seeking an order of preliminary relief "reversing
the retaliatory decision to classify [him] to Administrative
Segregation" and an order placing him in a "single-cell,
recreation-alone status, which were the same inmate management
type . . . that I was under when I was in the closed custody
program for my safety." Hrg. Tr. at 62-63; 66.  Accordingly,
Lopez seeks a mandatory injunction and must meet a higher
standard of review.  <u>D.D. ex rel. V.D. v. New York City Bd. of</u>
<u>Educ.</u>, 465 F.3d 503, 510 (2d Cir. 2006). Defendants argue that
Lopez has neither demonstrated that he will suffer irreparable
harm should this motion be denied nor shown a likelihood of
success on the merits of his claims. The Court has undertaken a
careful review of the record and finds that plaintiff has failed
to establish that "the alleged threats of irreparable harm are
not remote or speculative but actual and imminent." <u>New York v.</u>
<u>Nuclear Regulator Commission</u>, 550 F.2d 745, 775 (2d Cir. 1977).

"Inmates have no constitutionally protected right to be
confined in any particular correctional facility or housing
unit." <u>Jarecke v. Hensley</u>, 552 F. Supp. 2d 261, 265 (D. Conn.
2008) (citing <u>Olim v. Wakinekona</u>, 461 U.S. 238, 248 (1983)
(inmates have no right to be confined in a particular prison
within a given state); <u>Meachum v. Fano</u>, 427 U.S. 215, 225 (1976)
(transfer among correctional facilities, without more, does not

violate inmate's constitutional rights, even where conditions in one prison are "more disagreeable" or the prison has "more severe rules")).

Plaintiff contends that he was wrongly placed in Administrative Segregation, maintaining that he was falsely charged in retaliation for reporting an inappropriate sexual relationship between a staff member and an inmate.  Nevertheless, at the hearing, plaintiff admitted to the conduct that preceded the disciplinary reports, thereby undermining any claim that the disciplinary actions were retaliatory.  Plaintiff was provided with an appeal process by the DOC which is part of the record and an independent investigation was conducted by an officer from the Connecticut Department of Public Safety, who found no evidence of a conspiracy.  On this record, plaintiff has not shown that he was falsely charged or served with retaliatory disciplinary reports that resulted in his classification to Administrative Segregation.  Moreover, "[a]s this district has previously found, the improper classification of inmates in the custody of the Connecticut Department of Correction does not give rise to a civil rights action."  Taylor v. Rowland, No. 3:02CV229 (DJS), 2004 U.S. Dist. Lexis 1556, *8 (D. Conn. Feb. 2, 2004).

Lopez asks for an assignment to a single-cell, recreation-alone status with management similar to the Closed Custody Unit because he believes that his participation in the Administrative Segregation Phase Programming with inmate contact will expose him to assaults by inmates with ties to the Latin Kings.  It is

undisputed that plaintiff is currently housed in a single-cell, on recreation-alone status with no inmate contact. In essence, Lopez seeks a preliminary injunction compelling defendants to house him under the same conditions he is currently experiencing, but with personal property privileges.  Cahill testified that plaintiff remains in Phase I Administrative Segregation because he refuses to participate in out-of-cell programming at Phase II and there are no current plans to physically force plaintiff to accept a cellmate or to have any direct inmate contact.[9]

Plaintiff argues that he suffers irreparable harm "in the form of being indefinitely confined to Administrative Segregation . . . ."  Hrg. Tr. at 36. However, plaintiff's persistent refusal to progress through the various phases of Administrative Segregation will continue to subject plaintiff to the strict conditions of Phase I until plaintiff chooses to move to Phase II.  During the hearing, the Court asked plaintiff to describe how he is treated in Administrative Segregation as compared to his treatment in a Closed Custody Unit.  Lopez responded,

> There is differences that make a big
> difference.  More restrictions.  For example,
> every time I come out of the cell, I have to
> be fully restrained with handcuffs or
> shackles. I have to recreate in a cage
> instead of an open recreation yard.  I have
> less property. For example, I don't have any
> sneakers, no beard trimmers, no television
> set, greater stress, fewer restriction-
> greater restrictions on visiting privileges,
> greater restrictions on commissary
> privileges.

---

[9]Cahill testified that plaintiff refused to progress to Phase II as recently as a week before the injunction hearing.

22

> . . . The stress from the restrictions in
> Administrative Segregation affect me
> physically, mentally, and emotionally. Being
> classified to Administrative Segregation and
> such restrictive - of restrictive environment
> with inmates who are worst of the worst,
> causes me - what has caused me to degenerate
> in some form in some respects, morally,
> psychologically, spiritually.
>
> All of these adverse elements of being
> classified - or that are part of that
> Administrative Segregation weigh down on me,
> physically, mentally, and emotionally.

Hrg. Tr. at 36-37.  Lopez testified that his classification in

Administrative Segregation has been reviewed, but argues that one

of the "continuing forms of retaliation" is that defendants

> create the appearance of allowing me to
> participate in the Administrative Segregation
> Program, but when they offer me an
> opportunity to participate in the Program,
> the do it where there's a group with known
> enemies, which I will not walk into a group
> with known enemies, or people that will
> assault me, and they normally do this,
> because they know that I'll refuse, and then
> they create a pretext - by doing that, they
> create a pretext for fabricating a
> disciplinary report to continue my placement
> in Administrative Segregation indefinitely.

Hrg. Tr. at 38.

Lopez conceded that he has been classified by the DOC as

part of a Security Risk Group-the Latin Kings-since 2005. With

the exception of Francisco Roman, and two other inmates, who have

been identified by plaintiff, Lopez argues that any inmate with

23

gang affiliation is a threat.[10]  Cahill testified that plaintiff
has not specified "by whom and by what" he is threatened beyond
general comments that his life is in jeopardy.  Hrg. Tr. at 109;
Vega v. Lantz, No. 3:03-cv-2248 (PCD), 2007 U.S. Dist. Lexis
76640, *9 (D. Conn. Oct. 15, 2007) (denying injunctive relief
finding plaintiff "made no demonstration that he is subject to
actual and immediate subsequent harm.").  Cahill testified that
Lopez is profiled against several inmates who are housed at NCI
and that none of the inmates profiled by Lopez is housed in his
Unit.  Hrg. Tr. at 47.  He explained that, as an inmate moves to
Phase II, a background check is done to see if the group is
compatible to do the program together.

Defendants argue that "the practical effect of plaintiff's
motion is to obtain from the district court a classification
status that does not exist and that relieves that plaintiff from
all incentive to abandon his steadfast refusal to complete the
administrative segregation program." [Doc. #69 at 10].

On this record, the threat to plaintiff is, at best,
speculative. See Thompson v. Lantz, No. 3:04-cv-2084 (AWT), 2005
U.S. Dist. Lexis 39904, *13-14 (D. Conn. Sept. 28, 2005)
("plaintiff does not contest the fact that he is currently in a
cell by himself. Even if plaintiff is housed in a cell with
another inmate in the future, a claim that any cellmate might

---

[10]Cahill testified that plaintiff is unwilling to accept
placement in a single cell in  Phase II housing unit  temporarily
to observe the unit and identify the alleged individuals that he
claims want to assault him or bring him harm.  Hrg. Tr. at 103.

assault him is speculative.  Possible future harm is insufficient
to support a request for injunctive relief.").  Moreover, Lopez
has not demonstrated that the requirement to participate in the
Phase Program in Administrative Segregation has been applied in a
retaliatory manner.

The Eighth Amendment guarantees Lopez his "basic  human
needs-e.g., food, clothing, shelter, medical care, and reasonable
safety." DeShaney v. Winnebago County Dept. of Social Servs.,
489 U.S. 189, 200 (1989) (emphasis added). To prevail on an
Eighth Amendment claim, Lopez must show that his confinement
violates contemporary standards of decency. See Phelps v.
Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002). Restrictive or harsh
conditions do not satisfy this requirement. See Rhodes v.
Chapman, 452 U.S. 337, 347 (1981). Sharing a cell with another
inmate is not unconstitutional. See id. at 347-48  (holding that
double-celling inmates in an overcrowded facility was not
unconstitutional).

Lopez has provided no medical or mental health opinions  to
support his request for permanent confinement in single-cell,
recreation-alone status outside Administrative Segregation. From
his testimony, Lopez is asserting that the "irreparable harm" he
attributes to the stress of his confinement derives from the
restriction of personal property, visitation and the requirement
that plaintiff transition through the Phase Program that would
require out of cell programming.  He is not asserting
"irreparable harm" from his current living conditions in Phase I

25

Administrative Segregation.  Rather, Lopez is seeking a mandatory injunction compelling the DOC to reclassify him to fit his idea of the best conditions of confinement.  However, Lopez has "no constitutionally protected right to be confined in any particular correctional facility or housing unit." Jarecke, 552 F. Supp. 2d at 265. The record and the case law do not support plaintiff's motion for preliminary relief.  Lopez has not demonstrated irreparable harm or a likelihood of success on the merits of this claim.

Lopez's Motion for Preliminary Injunction **[Doc. #39]** is **DENIED**.

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).


Dated at Bridgeport, this 22nd day of January 2010.


_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE